## THE LANGHAM.

### (District Court, N. D. Ohio, E. D. January 19, 1914.)

### No. 2525.

COLLISION (§ 95*)—STEAMER AND TOW MEETING—PARTING OF TOW LINE.

A steamer with two barges in tow, the second of which, the Plymouth, had just been taken up, was turning in St. Clair river to head downstream, when the towline of the Plymouth parted, and she headed across, and drifted down upon the steamer Langham, which was then meeting and passing the tow part to port, and which backed and went to the eastward until she touched bottom. *Held*, that the collision was due solely to the fault of the Plymouth in furnishing an insufficient towline, and also either for not dropping an anchor, or for not having an anchor in a position where it could be used in case of emergency.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. § 95.*]

In Admiralty. Suit for collision by J. Joseph McTigue, owner of the barge Plymouth against the steamer Langham, with cross-libel by the owner of the Langham. Decree for cross-libelant.

Dorr E. Warner and L. B. Ware, both of Cleveland, Ohio, for libelant.

Goulder, Holding & Masten, of Cleveland, Ohio, for respondent.

DAY, District Judge. This libel and cross-libel involve a collision between the steamer Langham, up-bound, and the barge Plymouth, in tow of the steamer Adiramled, which also had the barge Melbourne in tow directly ahead of the Plymouth, in the St. Clair river, abreast of Marine City, Mich., at about 3 o'clock on the afternoon of Saturday, August 21, 1909.

The steamer Langham is a wooden freighter, 281 feet long, and 48 feet beam, while the barge Plymouth is a schooner barge, 213 feet long, 30 feet beam. The navigable channel where the collision occurred is about 1,800 feet wide, and on the Canadian side of the channel, below Bell river, which is on the American side, is Woodtick Island, which is surrounded by a shoal; this shoal as marked on the chart having a depth of from one to five feet.

The Langham was bound up, laden with coal, with the officers and crew properly placed. Previous to meeting the Adiramled, the Langham passed the boat Essex under one-blast signals, at which time the Langham was about in the middle of the river and was going about 10 miles an hour.

When the barge Plymouth was first seen, the tow was just starting to turn around. The Plymouth had been lying at a dock just below the mouth of the Bell river on the American side, and the Adiramled, with the Melbourne in tow, had gone down the river, rounded to, and come alongside of the Plymouth, and the Plymouth's towline was then passed to the stern of the Melbourne and made fast on the Melbourne. The towline was furnished by the Plymouth. The tow then started up the river, and started coming around on a port wheel, and the

Adiramled was about opposite the mouth of the Bell river, near the middle of the channel, and the Langham opposite the Michigan Salt Works, about a mile or a mile and a half apart. The Adiramled blew a two-blast passing signal. Those in charge of the navigation of the Langham have testified that an alarm whistle was blown, followed by a one-blast passing whistle, and at the same time that the Langham was checked. In any event, the one-blast passing signal was accepted by the Adiramled, and her captain testifies that this method of passing port to port was satisfactory to him.

While there is some dispute in the testimony, the Adiramled in all probability passed the Langham 150 to 200 feet off. The Melbourne was following along after the Adiramled; but the Plymouth did not straighten down after the Melbourne, but appeared to be going right across the river toward Woodtick Island.

From the weight of the evidence, at the time the Plymouth was observed to be adrift on board the Langham, the Langham had passed the Adiramled and was close on to the Melbourne. The Langham was then backed full speed astern, and at this time the Langham was close up to Woodtick Island, touched the bottom, and was stopped, and the forward part of the Plymouth struck the port bow of the Langham, breaking in several planks and frames and stanchions. The Plymouth then drifted down past the Langham.

The day was clear, and there was scarcely any wind blowing. The St. Clair river has a current of about two miles an hour at the point of collision. Until the towline attached to the Plymouth parted, there was no danger of collision between these various vessels.

It appears from the record that no undue strain was placed upon the towline, and that the Adiramled executed a proper maneuver in straightening out herself and her tows preparatory to going down the river. After the towline broke, the Plymouth had no means of self-propulsion, did not drop any anchor, and in the course of a few minutes drifted downstream athwart of the river.

The Plymouth did nothing but blow distress signals, which appear to have been blown at about the time that the Langham passed the Adiramled. The record does not satisfactorily show that this towline which parted was sufficient; it does not show that it was inspected, and the reasonable inference would be that this collision occurred by reason of the parting of an insufficient towline. From the time when the towline broke, until the time of the collision, a sufficient period of time elapsed to enable those in charge of the Plymouth to drop an anchor without any danger to any of the crew, had an anchor been placed in such a position as to have been serviceable. The Plymouth had two anchors forward, one on the port and another on the starboard side, each of which weighed not less than 1,200 pounds. They were lying on deck inside of the rail. To drop the anchor it was necessary to lift the anchor clear of the rail and fasten the same to the cat-head of the Plymouth by means of a steam windlass, and then drop the anchor from the cat-head into the water. It is apparent that the anchors were not so placed as to have been readily dropped.

The navigation of the Langham is criticised; it being urged on be-

half of the Plymouth that the Langham should have made an effort to have gone to the stern of the Plymouth, or, in other words, crossed between the Melbourne and the Plymouth. In view of the fact that the Langham was an up-bound boat, heavily laden, and that the Plymouth had considerable headway, the judgment of the captain of the Langham in steering towards Woodtick Island as far as he could, until prevented by shoal water, cannot be said to be improper navigation.

The collision was primarily caused by the parting of this towline. The evidence introduced on behalf of the Plymouth is not sufficient to show that she herself was not responsible for the parting of this line. The strain put upon this line by the Adiramled was usual, and one that would be expected in the towing of barges on rivers such as the St. Clair. As far as the anchors are concerned, either no effort was made to drop them, or else they were so placed as to render their dropping impossible. In any event, had the anchors been dropped, this collision might have been averted, and the Plymouth was at fault, either for not dropping these anchors, or for not having its anchors in shape to let them go in a case of emergency.

I am accordingly of the opinion that this collision was due solely to the fault of the Plymouth, and the libel will be dismissed, and a decree for cross-libelant entered for the full amount of damage it can show before a special master.